IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

Eastern District of Kentucky
**FILED**

JAN 15 2010

AT LONDON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
|  | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | 01-339-KKC |
|  | ) | |
| v. | ) | |
|  | ) | |
| WAL-MART STORES, INC. | ) | |
|  | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

## PLAINTIFF'S TRIAL BRIEF

In accordance with the Court's trial order (DE # 300), Plaintiff Equal

Employment Opportunity Commission ("EEOC"), files its trial brief.

## INTRODUCTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended

("Title VII"), 42 U.S.C. § 2000e et. seq.  The EEOC filed this suit on August 24, 2001

against Defendant, Wal-Mart Stores, Inc. ("Wal-Mart") alleging discriminatory hiring

practices at Wal-Mart's London, Kentucky Distribution Center # 6097 ("DC 6097") since

at least January 1, 1998.[1]  Wal-Mart answered, admitting jurisdiction, venue, and that it

is a covered employer within the meaning of Title VII. (DE # 3.) Trial of this case was

bifurcated on March 3, 2006. (DE# 82.)

---

[1] Wal-Mart moved to limit the temporal scope of the EEOC's suit to include discrimination occurring prior
to February 15, 2005. (DE # 11.)  The Magistrate judge recommended such a limitation and the Court
affirmed. (See August 14, 2009 Opinion and Order, DE # 417, adopting January 18, 2007 Order of
Magistrate Judge, DE # 129.)

563

The EEOC will present evidence during the phase one trial, beginning on March 1, 2010, which shows that Wal-Mart has engaged in a pattern or practice of sex discrimination against female applicants at DC 6097 since at least January 1998.  The EEOC brings this lawsuit against Wal-Mart on behalf of charging party Janice Smith, a class of women who were denied employment at DC 6097, and the general public.

## STATEMENT OF FACTS[2]

The EEOC will prove during the phase one trial that Wal-Mart engaged in a pattern or practice of discriminatory hiring, through the use of three different types of evidence.  First, the EEOC will present overwhelming statistical evidence illustrating a gender based disparity in offers to female applicants, after controlling for relevant factors.  Second, the EEOC will present an abundance of anecdotal evidence, including admissions of discriminatory practices, and evidence that female applicants and employees were denied hire and/or treated less favorably than male applicants and employees.   Finally, the EEOC's statistics and anecdotal evidence will be enhanced by evidence and expert testimony identifying the high likelihood of gender stereotyping by supervisors and managers who interviewed and hired applicants, as a result of Wal-Mart's entirely subjective interview and hiring process and its overwhelmingly male workforce.

---

[2] For a more detailed statement of facts, see EEOC's pending Response to Wal-Mart's Motion for Summary Judgment at pp. 4-40. (DE # 418.)

### A.    Janice Smith's EEOC charge.[3]

On or about October 8, 1998, Janice Smith sought a transfer from Wal-Mart's London, Kentucky Store to an order filler position at DC 6097. Wal-Mart denied her request. Having witnessed the transfers of numerous less or equally qualified male co-workers over three different transfer attempts, Smith filed a charge of discrimination with the EEOC alleging that Wal-Mart had discriminated against her based upon sex by denying her transfer to DC 6097.   The EEOC provided notice of the charge to Wal-Mart on January 29, 1999.  The EEOC conducted an investigation of Smith's allegations, obtained information on a class of hires and applicants, and concluded that Smith and a class of women had been denied employment as order fillers at DC 6097 because of their gender. Evidence revealed during the investigation included proof that female outside applicants who applied for employment at DC 6097 were rejected in favor of male applicants.  The EEOC then attempted conciliation on behalf of Smith and five other identified outside applicant class members, Tina McKinley, Linda McMillion, Theresa Mills, Brenda McKinney, and Melanie Sexton who had sought "any position," a "material handler position," or a "distribution" position.

### B.    Hiring at DC 6097.

From at least January 1, 1998 through at least February 15, 2005, Wal-Mart regularly advertised and interviewed applicants for entry level warehouse positions at DC 6097.  Interviewers, which included both management and non-management level employees, used a three interview process.  Regardless of the position applied for, applicants were most often interviewed for the order filler position.  It is undisputed that

---

[3] For a more detailed discussion of Janice Smith's administrative charge and the EEOC's investigation and related exhibits, see EEOC's Response to Wal-Mart's Motion for Summary Judgment at pp. 4-5. (DE # 418.)

there are no minimum requirements for warehouse positions at DC 6097, (Glover Dep. at 78-79, Gulock Dep. at 65-69)[4], and no minimum size or weight is necessary to perform the order filler position. (Giles Dep. I at 18)[5], and no strength or physical abilities tests are administered to applicants. (Gulock Dep. at 70-71, Earls Dep. at 53-54.) Christina Shoemaker, who is 5'5" and average framed, currently order fills at DC 6097 and she testified that the average weight of items lifted by order fillers on the "dry" side was 20 pounds, other than an occasional case of pickles or juice. (Shoemaker Dep. at 16, 25-26.)[6] She indicated that the weight lifted by order fillers in other areas was similar. (Id. at 24.)   Teresa Root, a current Wal-Mart manager who is 5'4" and small to medium framed and who, assisted in the dry order filling area as needed, testified that it did not take a particularly strong person to do the job and she thought that anybody could do the job. (Root Dep. at 32, 34.)[7] Kathy Kimble Pence, a former order filler, weighed 92 pounds and was 5'2" but was nevertheless capable of performing the order filler position. (Pence Decl. at ¶ 1.)[8]

New hires are extensively trained following hire, including training and certification in power equipment, if necessary. (Brewer Dep. at 43 and Brumley Dep. at 43-44.)[9] Order fillers assigned to the freezer area are given protective gear to wear, including bib, coat, gloves and face mask. (Shoemaker Dep. at 33-34.) Order fillers (and

---

[4] The cited pages of the Glover and Gulock depositions are attached as Ex. 1and Ex.2, respectively.

[5] The cited pages of the Giles deposition are attached as Ex.3.

[6] The cited pages of the Shoemaker deposition are attached as Ex. 4.

[7] The cited pages of the Root deposition are attached as Ex. 5.

[8] The Pence Declaration is attached as Ex. 6.

[9] The cited pages of the Brewer and Brumley depositions are attached as Ex.7 and Ex. 8, respectively.

other warehouse employees) work either first, second or third shift weekdays or

weekends. (Giles Dep. I at 108, 151-153.) Some employees work eight hour shifts five

days a week and some choose to work longer shifts fewer days a week. (Id. at 151-153.)

From 1998 through 2004, staffing of the warehouse positions at DC 6097 was

overwhelmingly male.  (Bielby Report at 17-31; Cobb Dep. 16-17; Biondo Dep. at 31;

Karr Dep. 26-27; Wal-Mart EEO -1 reports.)[10]   EEOC expert labor

economist/statistician Dr. Burt Barnow determined that Wal-Mart hired at DC 6097:

- 333 applicants in 1998, only 5 of whom were female;[11]

- 311 applicants in 1999, only 19 of whom were female;

- 294 applicants in 2000, only 3 of whom were female;

- 248 applicants in 2001, only 5 of whom were female;

- 64 applicants in 2002, only 2 of whom were female;

- 76 applicants in 2003, only 7 of whom were female; and

- 186 applicants in 2004, only 22 of whom were female.

For the entire relevant time period, Dr. Barnow determined that female applicants

fared worse at every stage of the screening process.  (Barnow Supp. Report at Supp. Ex.

B8.)[12]  After controlling for relevant variables,[13] Dr. Barnow concluded that from at least

---

[10] Dr. Bielby Report attached as Ex. 9; cited pages of the Cobb deposition attached as Ex. 10; cited pages of
the Biondo deposition attached as Ex. 11; cited pages of the Karr deposition attached as Ex. 12; EEO -1
reports attached as Ex. 13.

[11] The number of hires is based upon applicant information produced by Wal-Mart.  Because Wal-Mart
refused to produce applicant information for the period January 1, 1998 through April 17, 1998, this figure
does not reflect the full number of hires for 1998.

[12] Dr. Barnow Supp. Report Ex. B8 attached as Ex. 14.

[13] Variables controlled for included previous Wal-Mart employment, employment gap , fired from previous
job, transfer applicant, work permit, position applied for,  education level, felony convictions, theft/fraud
conviction, peak, full or temporary employment, shift availability, pay expectations, relative at Wal-Mart,

1998 through 2004, a statistically significant disparity in hiring by gender existed at DC 6097 and that approximately 229 additional women should have been hired during that time period.  From 1998-2002, Dr. Barnow concluded that the chance of the gender disparity occurring by chance (with a two tailed test) was less than .001.  (Barnow Supp. Report at Supp. Ex. B4.)[14]  For the 2002 through 2004 time period, the chance of gender disparity occurring by chance (with a two tailed test) was .0058 or roughly one in 500. (Id. at Supp. Ex. B5.)[15]

Due in part to Wal-Mart's late and incomplete submission of applicant and hire related materials, and in part due to poor quality non-uniform voluminous paper data, Dr. Barnow was forced to retract and rerun his regression analysis multiple times. Further, in response to claimed database errors by Wal-Mart expert Mr. Freeman, Dr. Barnow made database corrections as warranted.   Each time Dr. Barnow reran his analysis, there remained a statistically significant disparity in hiring based on gender at DC 6097. Moreover, Dr. Barnow performed confirmatory statistical testing on three Wal-Mart provided databases and the results in all three showed a statistically significant disparity in hiring. (See Dr. Barnow Rebuttal Report at pp. 12-14.)[16]

---

missing work history, month and year of application, whether received interview(s), previous applications, and previous work experience.  (See Barnow Supp. Report at Supp. Ex. B1, attached as Ex. 15.)  All variables were those contained in the application itself, and thus available for all applicants.

[14] Dr. Barnow analyzed the 1998-2002 and 2002-2004 periods separately.  (See Barnow Dep. at 288-293) He grouped the data in order analyze like periods together.  (Id. at 294-95.) He noted that breaking down data into one year periods has less statistical power and it would not be appropriate in this case to disaggregate the data in this manner.  The cited pages of the Barnow deposition are attached as Ex. 16; Dr. Barnow Supp. Report Ex. B4 attached as Ex. 17.

[15] Dr. Barnow Supp. Report Ex. B5 attached as Ex. 18.

[16] Dr. Barnow Rebuttal Report attached as Ex. 19.

### C.        Anecdotal Evidence of Gender Discrimination at DC 6097.

The EEOC will bolster its statistics with anecdotal evidence of discriminatory practices, and evidence that female applicants and employees were denied hire and/or treated less favorably than male applicants and employees. Some former managers will testify they relegated female applicants to "certain areas," other than order filling.  (See EEOC's Response to Wal-Mart's Motion for Summary Judgment at pp. 19-20, DE # 418.)  Others readily admit they were looking for "big, strong, young, guys" when hiring. (Id.)  One hiring manager and various coaches involved in interviewing applicants will testify that Wal-Mart refused to refer female applicants on in the hiring process, because they believed a man could perform the job better than a woman.  (Id.)

Female applicants will testify they were told women were generally not wanted for warehouse positions at DC 6097, which was confirmed by former Wal-Mart mangers and/or supervisors.  (See Id. at pp. 17-20.)  Kimberly Bebout's interviewer told her DC 6097 typically hires "young men between the ages of 18 and 25." (Bebout Dep. at 17, 71.)[17]  Sue Lawson's interviewer told her that most of the time Wal-Mart does not hire women to work in the freezer. (Sue Lawson Dep. at 26, 106, 167.)[18]  Laura Ludeman's interviewer told her they usually did not hire women on the floor. (Ludeman Dep. at 78-79.)[19]  Other women will testify that managers and supervisors who interviewed them were dismissive, sarcastic, and expressed disbelief as to their ability to perform the job. (Id. at 24-27.)  Still other female applicants will recount how Wal-Mart supervisors

---

[17] The cited pages of the Bebout deposition are attached as Ex. 20.

[18] The cited pages of the Lawson deposition are attached as Ex. 21.

[19] The cited pages of the Ludeman deposition are attached as Ex. 22.

and/or managers said their appearance would distract the men in the warehouse and lead to sexual harassment problems.  (Forbes Dep. at 69; Janice Smith Dep. at 121.)[20]

The EEOC will also produce evidence of Wal-Mart's completely subjective practice of placing well-qualified female applicants on "hold" while hiring numerous, often less qualified, male applicants, or failing to pass well-qualified women on in the interview process for no discernable reason.  (See EEOC's Response to Wal-Mart's Motion for Summary Judgment at pp. 31-39, DE # 418.)   In addition to being placed on hold, female applicants were also excluded from consideration after passing two interviews, receiving satisfactory reference checks, but prior to receiving a third interview. (Id. at pp. 39-40.)

> **D.     Wal-Mart's Highly Subjective Interviewing Process Was Vulnerable to Gender Stereotyping.**

Many Wal-Mart managers and supervisors, who conducted interviews for entry-level positions, received effectively no training on how to conduct an interview and objectively assess information solicited from applicants.  As a result, interviewers employed a highly subjective interview system with minimal oversight.  (See Id. at pp. 13-17.)[21]

EEOC expert Dr. William T. Bielby determined that social science research sheds light on the gender-based disparity in hiring at DC 6097.  After extensive review of Wal-

---

[20] The cited pages of the Forbes and Janice Smith depositions are attached as Ex. 23 and Ex. 24, respectively.

[21] In 2002, Wal-Mart instituted a new "behavioral" model for interviewing applicants.  However, interviewers were still not trained on how to exercise their discretion when making decisions, or to record the reason why someone was not passed to the next interview or rejected for hire. (See EEOC Response to Wal-Mart's Motion for Summary Judgment at pp. 16-17, DE # 418.)  Although this new behavioral model resulted in more successful interviewing of female candidates and more hiring of females into entry-level warehouse positions at DC 6097, it remained open to the subjective impressions of the interviewers.  (Id.)

Mart manger deposition testimony, information produced in discovery, and scholarly publications, (Biebly Report at 3-4, 7, and Ex. C)[22], Dr. Bielby concluded that Wal-Mart's highly discretionary selection system with minimal oversight, coupled with an overwhelmingly male workforce, and the physical nature of warehouse jobs, invites gender stereotyping and bias against female applicants.  (Bielby Report at 17-27.)  He further determined that the changes beginning in 2002, including changes in the hiring process and the filing of the EEOC's sex discrimination lawsuit resulted in a noticeable, but not complete, diminution in the gender-based hiring disparity.  (Id. at 32-35 and Bielby Rebuttal Report at 30-36.)[23]

## QUESTIONS OF FACT

Questions of fact will include:

Whether the EEOC can establish a prima facie case of a pattern or practice of discrimination?

Whether Wal-Mart can rebut the EEOC's overwhelming statistical and anecdotal evidence?

## ISSUES OF LAW

**A.      Pattern or Practice Sex Discrimination.**

EEOC alleges a pattern or practice case of sex discrimination under Title VII and bears the initial burden of showing, by a preponderance of the evidence, that a pattern or practice of differential treatment was Wal-Mart's standard operating procedure. Bazemore v. Friday, 478 U.S. 385, 398 (quoting Int'l Bhd. of Teamsters v. U. S., 431

---

[22] Dr. Bielby Report attached as Ex. 9.
[23] Dr. Bielby Rebuttal Report attached as Ex. 25.

U.S. 324, 336 (1977)).[24]   However, because the basis of this lawsuit is not individual acts of disparate treatment, but rather disparate treatment stemming from an overarching discriminatory pattern or practice by many decisionmakers over an extended period of time, the EEOC is not required to produce direct or comparative evidence that each woman in the class was a victim of Wal-Mart's illegal pattern or practice of discrimination. Teamsters at 360-361; See also  EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)("in determining pattern or practice liability, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a prima facie case that such a policy existed."); U.S. v. Lansdowne Swim Club, 713 F. Supp. 785, 807 (E.D. Pa. 1989) ("A pattern or practice of discrimination may be found even if a defendant does not discriminate uniformly.") aff'd 894 F.2d 83 (3d Cir. 1990); United States v. Ironworkers Local 86, 443 F.2d 544, 552 (9th Cir.), cert. denied, 404 U.S. 984 (1971) (same).

Once the EEOC establishes a prima facie case, the burden of production shifts to Wal-Mart to rebut the prima facie showing.  Teamsters, 431 U.S. at 360.   In Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984), the Court discussed the nature of the burden on a defendant in a pattern or practice disparate treatment case as follows:

> The defendant must at least make a clear and reasonably specific showing, based on admissible evidence, that the alleged nondiscriminatory explanation in fact explains the disparity…[T]o make an initial showing of disparate treatment in such cases the plaintiff class will typically have presented statistical evidence showing pervasive disparities and eliminating most, if not all, potential nondiscriminatory explanations for the observed disparities. Though the employer is not required to meet a burden of persuasion in rebutting the disparate treatment claim, the nondiscriminatory explanation must cast sufficient doubt on

---

[24] Title VII pattern or practice analysis involves two phases: the initial phase, in which the court will focus on whether unlawful discrimination "has been a regular procedure or policy followed by an employer"; and the second phase during which the court determines appropriate individual remedies.  Teamsters, 431 U.S. 324, 360-361 (1997); see also Thiessen v. GE Capital Corp., 267 F.3d 1095, 1106 (10th Cir. 2001).

the plaintiffs' proof to permit the trier of fact legitimately to decline to draw an inference of discrimination from that proof. The bare articulation of a nondiscriminatory explanation, while sufficient to rebut an individual plaintiff's low-threshold McDonnell Douglas showing, generally will not suffice as a rebuttal to a typical class-wide showing of pervasive discrimination.

Id. at 1268-70 (internal citations and footnotes omitted).  Moreover, Wal-Mart cannot rebut the EEOC's statistical evidence by mere "conjectures or assertions, without introducing evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, nondiscriminatory selection criterion." Bazemore v. Friday, 478 U.S. 385, 400 (1986).

> 1.    **Intent can be inferred from statistical disparities and evidence of stereotyping and subjective decisionmaking.**

Intentional discrimination can be inferred from statistical disparities.  Craik v. Minnesota State Univ. Bd., 731 F.2d 465, 479 (8th Cir. 1984) (statistically significant disparities in employment outcomes permit an inference of intentional discrimination); Catlett v. Missouri Highway and Transp. Comm'n, 828 F.2d 1260, 1265 (8th Cir. 1987)(same). See also Segar v. Smith, 738 F.2d 1249, 1265–1266 (D.C. Cir. 1984) ("Illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group.").

Similarly, evidence of stereotyping and subjective decisionmaking, including expert testimony, can be used to establish intentional discrimination.  While Wal-Mart mistakenly asserts Dr. Bielby's opinions regarding stereotyping and subjective decisionmaking cannot support an inference that Wal-Mart engaged in an intentional practice of gender discrimination, (Wal-Mart's Summary Judgment Memorandum at p. 34), numerous courts agree such evidence is precisely the kind of convincing anecdotal proof that coupled with statistical evidence can sustain a pattern or practice case such as

this one. See Price Waterhouse v. Hopkins, 490 U.S. 228, 255-56 (1989); Payne v. Travenol Lab., Inc., 673 F.2d 798, 817 (5th Cir. 1982) ("hiring processes that rely heavily on subjective interviewing provide an opportunity for the intentional discrimination that lies at the heart of a disparate treatment case."); Watson v. Fort Worth Bank and Trust, 487 US. 977, 990-91 (1988) (undisciplined subjective decisionmaking that has the same effects as intentional discrimination is equally vulnerable to interdiction under Title VII). See also McReynolds v. Sodexho, 349 F. Supp. 2d. 1, 20 (D.D.C. 2004); Halbrook v. Reichhold Chemicals, 766 F. Supp. 1290, 1296 (S.D.N.Y. 1991) aff'd without opinion, 956 F.2d 1159 (2d Cir. 1992) (plaintiff "need not demonstrate that her employer bears a conscious animus or malice toward women. Indeed, illegal discrimination often arises out of very subtle stereotyping that may reflect a benign or protectionist view of women and their place in society.") (citing Lenihan v. City of New York, 636 F. Supp. 998, 1009 (S.D.N.Y. 1985)).[25]

2.    **Even standing alone, the EEOC's statistics establish a prima facie case of discrimination.**

Standing alone, statistical evidence can establish a prima facie case of a pattern or practice of gender based hiring at DC 6097.  In Hazelwood Sch. Dist. v. United States,

---

[25]  See also Jauregui v. City of Glendale, 852 F.2d 1128, 1135-1136 (9th Cir. 1988) (subjective decisionmaking processes should be viewed with skepticism as they provide a ready mechanism for discrimination); Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 481 (9th Cir. 1983) (subjective hiring practices are well suited to the disparate treatment focus on intentional discrimination); Nanty v. Barrows Co., 660 F.2d 1327, 1334 (9th Cir. 1981) (overruled on other grounds) (subjective hiring systems "provide a convenient pretext for discriminatory practices"); Cook v. Billington, 59 Fair Empl. Prac. 1010, 1013 (D.D.C. 1992) ("excessive subjectivity in employment decisions is traditionally viewed with skepticism by courts, as subjectivity is often a convenient pretext for discriminatory practices."); Taylor v. Teletype Corp., 648 F.2d 1129, 1135 (8th Cir. 1981) cert. denied, 4 U.S, 969 (1981) (approving trial court's consideration of the company's subjective decisionmaking in finding discrimination and citing Satz v. ITT Financial Corp., 619 F.2d 738, 746 (8th Cir. 1980); Fisher v. Proctor & Gamble Manufacturing Co., 613 F.2d 527, 546 (5th Cir. 1980); Donnell v. General Motors Corp., 576 F.2d 1292,1298 n.12 (8th Cir. 1978)); EEOC v. Rodriguez, 66 Fair Emp. Prac. Cas. (BNA) 1649, 1671-1672 (E.D. Cal. 1994); Stender v. Lucky Stores, 803 F Supp. 259, 319, 323 (N.D. Cal. 1992).

433 U.S. 299, 307-08 (1977), the Supreme Court found that "[w]here gross statistical disparities can be shown, they alone … may constitute prima facie proof of a pattern or practice of discrimination."[26]   Here, Dr. Barnow found the gender based hiring disparity to be statistically significant for the entire relevant time period, which means he found that likelihood of the reported gender disparity happening by chance, without discrimination, to be less than .05.  (Barnow Supp. Report at Supp. Ex. B4 and B5.) "Statistical significance is a measure of probability that the outcome occurred by chance: The lower the probability that the observed outcome occurred by chance, the stronger the inference of discrimination can be drawn from the data."  Segar, 738 F.2d at 1282.  When a plaintiff shows a significant statistical disparity "he or she has provided strong evidence that chance alone is not the cause…."  Barnes v. Gencorp, Inc., 896 F.2d 1457, 1466, 1469 (6th Cir. 1980).

Courts have held that a rate of disparity is statistically significant when it is .05 or less.  EEOC v. Atlas Paper Box Co., 868 F.2d 1487, n.11 (6th Cir. 1989) (prima facie case established when met .05 level of statistical significance.).  Generally, two standard deviations is the accepted level of statistical significance for statistical evidence in employment discrimination cases. See, e.g., Castaneda v. Partida, 430 U.S. 482, 496–97 n.17 (1977); Hazelwood, 433 U.S. at 308-09 n.14 (1977).  A .05 chance corresponds to 2 standard deviations and a .001 chance corresponds to 3 standard deviations. Segar v. Smith, 738 F.2d at 1249 n. 28.

---

[26] See also Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1359 n. 7 (6th Cir. 1981) ("[s]tatistical evidence may establish a prima facie case of employment discrimination in an individual action as well as in a class action."); EEOC v. Akron National Bank and Trust Co., 497 F. Supp. 733 (N.D. Ohio 1980) (unexplained statistical proof of gender disparities is proof of discriminatory placement); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 402 (S.D. Ohio 1985)("statistical evidence is typically used in class action lawsuits similar to this case at bar in an effort to establish a prima facie case of a pattern [or] practice of unlawful discrimination…").

**3.**     **Wal-Mart's criticisms of Dr. Barnow's analyses are meritless as well as legally insufficient.**

Based upon its disclosures, Wal-Mart does not plan to offer any evidence on the number or percentage of female hires at DC 6097.  Nor does it plan to offer any evidence that its criticisms of Dr. Barnow's data in any way affect Dr. Barnow's highly statistically significant results.   However, Wal-Mart's critiques of Dr. Barnow's analysis can only be considered if Wal-Mart demonstrates that an alternative analysis would lead to a more favorable result.  EEOC v. Gen. Tel. Co., 885 F.2d 575, 579–82 (9th Cir. 1989), cert. denied, 498 U.S. 950 (1990) ("[T]he defendant cannot rebut an inference of discrimination by merely pointing to flaws in the plaintiff 's statistics.").[27]

Likewise, Wal-Mart fails to offer evidence that the inclusion of additional variables in Dr. Barnow's regression analysis would produce a more favorable result for Wal-Mart.  See Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 653–54 (5th Cir. 1983), cert denied, 466 U.S. 927 (1984)("defendant must do more than raise theoretical objections to the data or statistical approach taken; instead, the defendant should demonstrate how the errors affect the results"); Catlett v. Missouri Highway and Transp. Comm'n, 828 F.2d 1260, 1266 (8th Cir. 1987), cert. denied, 485 U.S. 1021 (1988) (mere assertion that an omitted factor would explain the disparities found is insufficient to rebut the inference of discrimination from the statistical analysis; burden is on defendant to submit "direct evidence demonstrating that [the omitted factor] accounted for the disparity"); Segar, 738 F.2d at 1277.

---

[27] See also Bazemore, 478 U.S. at 399–400, 403-04 n.14 (1986) (defendant "made no attempt...to demonstrate that when these factors were properly organized and accounted for there was no significant disparity between the salaries of blacks and whites"; thus, defendant's argument that factors were omitted from plaintiffs' analysis, making that analysis unsound, was rejected).

As noted earlier, Dr. Barnow accounted for nearly every variable included on the employment applications - - variables that were contained in the application itself, and thus available for all applicants.  As the Supreme Court has recognized, "[a] regression analysis which accounts for the major factors in an employment decision is acceptable evidence of discrimination, even if some variables have been omitted."  Bazemore, 478 U.S. at 399-400[28]

Wal-Mart's claim that Dr. Barnow improperly used aggregate data in his statistical analysis is similarly meritless.   Although Wal-Mart's own rebuttal expert, Mr. Freeman, makes no such claim, Wal-Mart erroneously asserts in its Summary Judgment Motion and Barnow related Daubert motion that Dr. Barnow should have analyzed each individual year rather than the 1998-2001 and 2002-2004 time periods. (See Wal-Mart's Summary Judgment Memo. at pp. 23–24; Wal-Mart Motion to Exclude Dr. Barnow at p. 34.)  Wal-Mart suggests that there was no statistically significant disparity in hiring during 2002, 2003 or 2004 individually, but that Dr. Barnow combined the three years solely to achieve statistical significance. However, Dr. Barnow explained that breaking down data into one year periods has less statistical power and it would not be appropriate in this case to disaggregate the data into one year periods.  (Barnow Report at p. 4 and

---

[28] See also Barnes v. Gencorp Inc., 896 F.2d 1457, 1466 (6th Cir. 1980) ("Not every conceivable factor relevant to a promotion decision must be included in the statistical presentation in order to make out a prima facie case."); Segar, 738 F.2d at 1276 ("[T]he law is clear that a plaintiff's proof must account for objective qualifications; exclusion of subjective requirement … is entirely proper."); Palmer v. Schultz, 815 F.2d 84, 101 (D.C. Cir. 1987)("Implicit in the Bazemore holding is the principle that a mere conjecture or assertion on the defendant's part that some missing factor would explain the existing disparities between men and women generally cannot defeat the inference of discrimination created by the plaintiff's statistics."); Sobel v. Yeshiva Univ., 839 F.2d 18, 34 (2d Cir. 1988) (The University did not show that the apparent gender disparity would in fact be reduced if these variables were taken into account; the University's experts criticized plaintiff's failure to include the variables, "offering not reason, in evidence or analysis, for concluding that they correlated with sex an therefore were likely to affect the sex coefficient."); McAlester v. United Airlines, Inc., 851 F.2d 1249, 1259 (10th Cir. 1988)("United presents no expert testimony that the failure of McAlester's expert to consider these factors changed his statistical determination that the high rate of minority termination was not the result of chance.").

n.4.)[29]        Furthermore, Dr. Barnow aggregated the data into those particular periods

because 1) the EEOC filed its lawsuit in late 2001; 2) Wal-Mart changed its application

process in 2002; and 3) the male/female differential in hiring changed in 2002.  (Barnow

Dep. at 288-93.)[30]   Moreover, in 2002 and 2003, DC 6097 only hired 64 and 76 people,

respectively.   (Barnow Supp. Report at Supp. Ex. B11.)[31]  Of those 140 people, only 9

were women (2 in 2002 and 7 in 2004).  (Id.)  Thus, the sample size for those years

individually was too small to establish an accurate statistical result. (Barnow Dep. at

299.)

        Dr. Barnow's use of aggregate data validly supports a pattern or practice of

discrimination. The use of "aggregate data is acceptable 'where it is more probative than

subdivided data.'" Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 649 (N.D. Cal.

2007) (quoting Paige v. California, 291 F.3d 1141, 1148 (9th Cir. 2002)).  See also

Paschal v. Flagstar Bank, 295 F.3d 565, 584 (6th Cir. 2002) (jury properly accepted

aggregated data).  The use of aggregated data is "particularly appropriate where small

sample size may distort the statistical analysis and may render any findings not

statistically probative."  Paige, 291 F.3d at 1148 (internal citations omitted).  As one

court noted, an "employer's attempt to demonstrate there was no statistically significant

evidence of discrimination when data was broken down by city or year or both was an

unfair and obvious attempt to disaggregate data to point where it was difficult to

demonstrate statistical significance." Capaci v. Katz and Besthoff, Inc., 711 F.2d.

647,654-655 (5th Cir. 1983).

---

[29] Dr. Barnow Report attached as Ex. 26.

[30] The cited pages of the Dr. Barnow deposition are attached as Ex. 16.

[31] Dr. Barnow Supp. Report Ex. B11 attached as Ex. 27.

Finally, the corrections Dr. Barnow made to his database only strengthen the statistical evidence of discrimination.  Dr. Barnow made corrections to his database due to either: 1) Wal-Mart's late production of applicant and hire information or 2) in response to Mr. Freeman's Responsive Expert Report.  Importantly, each time Dr. Barnow reran his analysis, based on new information, his results of a statistically significant hiring disparity at DC 6097 remained unchanged.   See Wal-Mart v. Oore Inc., 2009 WL 224908, *4 (N.D. Miss. Jan. 28, 2009) ("when a mistake is discovered and fixed it advances the cause of justice.").

### 4.       The Anecdotal Evidence Reveals a Pattern or Practice of Gender Discrimination in Hiring.

While a plaintiff may use anecdotal evidence to bolster its statistical evidence,[32] courts routinely hold that a plaintiff may use individual instances of discrimination alone to prove a pattern or practice prima facie case. See Pitre, 843 F.2d at 1262; EEOC v. CRST Van Expedited, 611 F. Supp. 2d 918, 954 (N.D. Iowa 2009)(quoting Catlett, 828 F.2d 1260, 1265 (8th Cir. 1987) ("Either [statistical or anecdotal evidence recounting specific instances of discrimination] alone may be sufficient to establish a pattern or practice of discrimination.); Morgan v. United Parcel Services of America, Inc., 380 F.3d 459, 466 (8th Cir. 2004) (statistics not required to establish a pattern or practice).  Myriad evidence from Wal-Mart managers and supervisors, rejected female applicants, and other Wal-Mart employees further supports that Wal-Mart engaged in a pattern or practice of discrimination in its hiring process.

---

[32] See Teamsters, 431 U.S. at 338-39 (Statistical evidence was bolstered by testimony of individuals who recounted specific instance of discrimination. The anecdotal evidence brought "the cold numbers convincingly to life.")

The EEOC intends to introduce certain evidence outside the time period of the pending action, i.e., January 1, 1998 through February 15, 2005.  First, the Court has ruled the EEOC may properly introduce evidence of  events and instances since February 2005 that would be "probative as to Wal-Mart's gender animus for the 1998-2005 period at DC 6097…[such as] changes in policy; training; actions indicating cognizance of prior discrimination; allegations of discrimination that surfaced post February 2005 but related to the 1998-2005 period; and, allegations of bias, regardless of timeframe, directly involving Wal-Mart's DC 6097 decisionmakers for the 1998-2005 period."  (See August 14, 2009 Opinion and Order, DE # 417, adopting January 18, 2007 Order of Magistrate Judge, DE # 129.)

Second, plaintiffs frequently rely on evidence outside the limitations period to establish that an act occurring within the limitations period was unlawful.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.133, 151-53 (2000).  Evidence of past conduct or prior incidents of discrimination "has a tendency to make the existence of a fact that is of consequence - - the defendant's discriminatory motive or intent - - more probable than it would be without the evidence…"  Stair v. Lehigh Valley Carpenters Local 600, 813 F. Supp. 1116, 1118-19 (E.D. Pa. 1993); Lee v. City of Columbus, 2009 U.S. Dist. LEXIS 112013 (S.D. Ohio Nov. 13, 2009) (admitting prior acts and conduct predating the two year statute of limitations period of plaintiff's claim to show what events led to her alleged constructive discharge).

In Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), addressing past acts that are "independently discriminatory," the Court ruled that the statute "does not bar an employee from using the prior acts as background evidence in support of a

timely claim."  The <u>Morgan</u> decision did not alter the existing law on the application of

the continuing violations doctrine to pattern or practice claims, continuing to allow

extensions of the statute of limitations in such cases.[33]   Under the continuing violation

theory, a plaintiff is "entitled to have a court consider all relevant actions allegedly taken

pursuant to the employer's discriminatory policy or practice, including those that would

otherwise be time barred." <u>Alexander v. Local 496, Laborers' Int'l Union of N. Am.</u>, 177

F.3d 394, 408 (6th Cir. 1999) (quoting <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d

708, 713 (2d Cir. 1996)); <u>See</u> <u>also</u> <u>Haithcock v. Frank</u>, 958 F.2d 671, 677 (6th Cir. 1992)

(when "there is an ongoing, continuous series of discriminatory acts, they may be

challenged in their entirety as long as one of those discriminatory acts falls within the

limitations period.").

> ### 5. Evidence of Stereotyping and Subjective Decisionmaking Supports the Pattern or Practice of Discrimination.

Wal-Mart's completely subjective and decentralized decision-making process

allowed interviewers to impermissibly employ gender stereotypes in making hiring

decisions.  Courts have consistently held that subjective decisionmaking processes should

be viewed with serious scrutiny, especially in cases like this were other evidence of

discrimination is present.  <u>Carroll v. Sears, Roebuck & Co</u>., 708 F.2d 183, 190, 192 (5th

Cir 1983) (excessive subjectivity is relevant to prove a pattern or practice of

discrimination, particularly when coupled with a significant statistical disparity).  If Wal-

Mart systematically excluded women from warehouse positions based on a sexual

---

[33] The Sixth Circuit has rightly recognized that <u>Morgan</u> did not implicate the category of continuing violations involving "long standing and demonstrable policies of discrimination." <u>Sharpe v. Cureton</u>, 319 F.3d 259, 268 (6th Cir.), <u>cert.</u> <u>denied</u>, 124 S. Ct. 228 (2003).

stereotype, it can be found liable under Title VII for intentional discrimination. EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1284 (11th Cir. 2000).

Expert testimony of stereotyping and subjective decisionmaking often proceeds under a "social framework analysis," in which the point is to provide information to the factfinder about how stereotyping operates, what stereotypes are prevalent, and circumstances under which decisionmakers are more likely or less likely to rely on stereotypes. Federal courts have readily admitted testimony on this subject. See, e.g., EEOC v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 460-62 (S.D.N.Y. 2004) (social framework analysis is a reliable methodology); Dukes v. Wal-Mart Stores, Inc., 222 FR.D. 189, 191-92 (N.D. Cal. 2004)(same); Robinson v. Jacksonville Shipards, Inc., 760 F. Supp. 1486, 1505 (M.D. Fla. 1991) (testimony regarding stereotyping "provided a sound, credible theoretical framework"); Jenson v. Eveleth Taconite Co., 824 F. Supp. 847, 881-82 (D. Minn. 1993) (same).[34]

**B.     The EEOC has met all jurisdictional and procedural prerequisites.**

In its Answer, (DE #3), Wal-Mart admitted jurisdiction, venue, and that is a covered employer within the meaning of Title VII, and raised the following affirmative defenses associated with the Phase I trial:

> (1) Some or all of plaintiff's claims fail to state an action upon which relief can be granted;
>
> (2) Some or all of the claims set forth in plaintiff's complaint are barred by the doctrines of consent, waiver, estoppel and laches;
>
> (3) Discriminatory acts alleged by plaintiff, if any, were done without the knowledge of defendant and in direct violation of its work rules and policies;

---

[34] See also Butler v. Home Depot, Inc., 984 F. Supp. 1257, 1265 (N.D. Cal. 1997); Stender v. Lucky Stores, Inc. 803 F. Supp. 259, 301-03, 327 (N.D. Cal. 1992); Hurst v. F.W. Woolworth Co., 1997 WL 685341 (S.D.N.Y Nov. 3, 1997); Flavel v. Svedala Indus. Inc., 1994 WL 761447 (E.D. Wis. Oct. 25, 1994).

(4) Defendant maintains strict policies prohibiting discrimination in any form, including on the basis of gender;

(5) All employment decisions were made for legitimate non-discriminatory reasons;

(6) Plaintiff has failed to exhaust administrative remedies.

During discovery, the EEOC asked Wal-Mart to identify all facts and documents supporting its affirmative defenses. (See Wal-Mart's Answers to EEOC's Tenth Set of Interrogatories at pp. 15 - 23, attached as Ex. 28.) Of the six "affirmative defenses" listed above, four are simply Wal-Mart's denial that it engaged in discriminatory practices. The discussion here is therefore limited to the remaining two affirmative defenses: (1) some or all of the claims set forth in plaintiff's complaint are barred by the doctrines of consent, waiver, estoppel and laches; and, (2) plaintiff has failed to exhaust administrative remedies.

### 1.     Wal-Mart Cannot Establish Consent, Waiver, Estoppel or Laches

In support of its argument that the claims set forth in plaintiff's complaint are barred by the doctrines of consent, waiver, estoppel and laches, Wal-Mart asserts:

> [S]ome class members were in fact hired by Wal-Mart, thus they are estopped from asserting a claim of discrimination in hiring. Further, class members failed to exhaust their available administrative remedies and are therefore estopped from asserting their claims. Finally, many class members are not qualified and/or did not apply for the job of orderfiller or entry level warehouse and/or removed themselves from consideration for employment and, therefore, are estopped from and/or have waived any right to claim that they were not hired because of their gender and/ or consented to not being hired.

Ex. 28 pp. 17-18. Nothing in these allegations even suggests that Defendant will be able to meet its burden to establish an affirmative defense of consent, waiver, estoppel or laches, or even that any such defenses applies here.

Wal-Mart's consent defense is based on its claim that certain individuals consented to not being hired.  Even if true, "consent" is not an affirmative defense because Wal-Mart bears no burden to prove that it fulfilled any legal duty.  Rather, it is the EEOC's burden to prove that the reason for Wal-Mart's non-hire of the class is sex discrimination.  See, e.g., Marino v. Otis Engineering Corp., 839 F.2d 1404, 1407 (10th Cir. 1988) (a defense is not an affirmative defense where "it merely negates an element of the plaintiff's prima facie case") (internal citations and quotations omitted); Etienne v. Wal-Mart Stores, Inc., 197 F.R.D. 217, 221 (D. Conn. 2000) (consent not an affirmative defense where it simply negates an element plaintiff must prove).  Wal-Mart is free to argue that certain class members "consented" to not being hired to rebut the EEOC's case, but this simply boils down to a denial of the EEOC's claims.

Wal-Mart's waiver defense will also fail.  "Waiver is the intentional relinquishment or abandonment of a known right."  Days Inn Worldwide, Inc. v. Patel, 445 F.3d 899, 905 (6th Cir. 2006) (internal citation and quotation omitted).  Wal-Mart's allegation that some class members were unqualified for order filler jobs fails to show that such individuals intentionally relinquished any known right.  Likewise, Wal-Mart's allegation that some class members removed themselves from consideration for employment, even if true, fails to identify any known right that such individuals allegedly relinquished.  Wal-Mart's estoppel argument fares no better.  Wal-Mart fails to indicate which doctrine of estoppel is seeks to establish, but it can establish none.  All estoppel doctrines require, at minimum, that the party advancing the defense show that it has done or failed to do some act in reasonable reliance on the conduct or statements of the other party.  See, e.g., Owen of Georgia, Inc.v. Shelby Co., 648 F.2d 1084, 1095 (6th Cir.

1981) (promissory estoppel: "Where one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise."); Horton v. Ford Motor Co., 427 F.3d 382, 388 (6th Cir. 2005) (equitable estoppel: "A party triggers equitable estoppel by conduct inconsistent with a position later adopted that prejudices the rights of the other party who detrimentally relied on the prior conduct."). Wal-Mart cannot assert any facts to show detrimental reliance. As for its laches defense, Wal-Mart asserts no facts in support of such a defense.

Wal-Mart's arguments here boil down to an argument that certain class members, because of their actions, are not entitled to relief. The EEOC alleges that all class members were denied hire by Wal-Mart for discriminatory reasons. In sum, Wal-Mart's arguments concern who is and who is not entitled to relief, and do not constitute a defense to liability.

### 2. Wal-Mart Cannot Establish that Plaintiff Failed to Exhaust Administrative Remedies

In support of its argument that the plaintiff has failed to exhaust administrative remedies, Wal-Mart argues:

> Charging Party Janice Smith was the only class member who exhausted her administrative remedies prior to filing suit. Her allegations are not related to new hiring, because she was a transfer. Other class members alleged discrimination in the new hiring process, which is wholly distinct from the transfer process, and these members have not exhausted their administrative remedies.

Ex. 26 pp. 23, 17 -18. Wal-Mart will be unable to establish this defense. "[E]xhaustion of administrative remedies is an issue when the suit is brought by a private party but not

23

when the Commission is the plaintiff." EEOC v. Caterpillar, Inc., 409 F.3d 831, 832-33 (7th Cir. 2005). The Court explained the difference as follows: if a private party is permitted to add claims in court not presented in the charge, the statutory scheme would be by-passed, but this is not the case when the EEOC brings the suit. See id. at 833. It is well established that an EEOC suit is not "confined to claims typified by those of the charging party." Id. (citing General Tel. Co. v. EEOC, 446 U.S. 318, 331 (1980) (internal quotations omitted)). Thus, Wal-Mart's claim that discrimination against outside applications is not "related" to discrimination against transfer applicants has no legal relevance to the question of exhaustion of administrative remedies.[35]

The relevant question is whether the claims brought in this case are of the kind that would be reasonably uncovered during an EEOC investigation. See EEOC v. Keco Inds., Inc., 748 F.2d 1097, 1100 (6th Cir. 1984) ("a complaint filed by the EEOC is limited to the investigation *reasonable expected to grow* out of the initial charge of discrimination") (emphasis in original). During the course of the investigation of Smith's allegations, the EEOC obtained information on large numbers of hires and applicants. Smith's allegations triggered an investigation into whether there was widespread discrimination hiring against women at DC6097. The investigation revealed proof that female outside applicants who applied for employment at DC 6097 were rejected in favor of male applicants. The EEOC issued a determination finding that Smith and a class of women had been denied employment as order fillers at DC 6097 because of their gender.

---

[35] Even if this were a private suit, there would be no question that administrative remedies have been exhausted. See EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 840 (6th Cir. 1994) ("it would be wasteful for numerous employees with the same grievances to file identical complaints with the EEOC. … Consequently we … hold where a substantially-related non-filed claim arises out of the same time frame as a timely filed claim, the complainant need not satisfy Title VII's filing requirement to recover.").

The EEOC then attempted to conciliate on behalf of Janice Smith and five other outside applicants (who are now class members) who sought various positions other than order filler.  Since all claims raised in the EEOC's complaint could reasonably be expected to grow out of the investigation of Smith's charge, the EEOC's properly includes allegations of discrimination with respect to all female applicants and all positions at DC 6097.

### C.     The EEOC's Lawsuit Properly Covers Harm Beginning January 1, 1998.

As evidenced by the EEOC's Complaint and EEOC statistical expert Dr. Barnow's Report, Rebuttal Report and Supplemental Report, which all compute shortfall beginning at January 1, 1998, the pending litigation has a January 1, 1998 start date. Because the basis of this lawsuit is not individual acts of disparate treatment, but rather disparate treatment stemming from an overarching discriminatory pattern or practice by many decision makers over an extended period of time, the start point of Defendant's liability can go as far back as the start point of its discriminatory policy or practice.

In National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court held in the context of an individual case that the continuing violation doctrine does not apply to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," id. at 114, but affirmed that the doctrine does apply to hostile work environment claims, id. at 117.  The Court explicitly left open the question of whether the continuing violation doctrine applies to claims such as those at issue here involving a pattern or practice of discrimination.  Id. at 115 n.9.  The Sixth Circuit has answered that question in the affirmative.  In Sharpe v. Cureton, 319 F.3d 259 (6th Cir. 2003), the Court stated that cases involving a "long standing and demonstrable policy of discrimination" in

which some form of discrimination "was the company's standard operating procedure" are "not implicated by <u>Morgan</u>."  <u>Id.</u> at 268-69.  Rather, these cases are governed by Sixth Circuit law on continuing violations, which provides that "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." <u>Id.</u> at 267 (citing <u>Alexander v. Local 496, Laborer's Int'l Union of N. America</u>, 177 F.3d 394 (6th Cir. 1999)).  Thus, the earliest instance of sex discrimination which the EEOC can establish is part of the pattern and practice of sex discrimination at issue in this case is timely and marks the start point for Defendant's liability.

## CONCLUSION

The EEOC's statistical evidence illustrates a gender based disparity in offers to female applicants.  The EEOC's anecdotal evidence, including admissions of discriminatory practices, and evidence that female applicants and employees were denied hire and/or treated less favorably than male applicants and employees, reinforces the EEOC's statistical findings.  Finally, evidence and expert testimony regarding gender stereotyping in an environment of subjective decision making and an overwhelmingly male workforce further strengthens the EEOC's case.  This combined evidence is more than sufficient to establish a prima facie case of a pattern or practice of discriminatory hiring at DC 6097.  Wal-Mart's attacks on the EEOC's evidence are inadequate to counter the EEOC's prima facie case.  Therefore, a reasonable jury should conclude that between 1998 and 2005, Wal-Mart engaged in a pattern or practice of discriminatory hiring at DC 6097.

Respectfully submitted,


LAURIE A. YOUNG,
Regional Attorney

MICHELLE EISELE,
Supervisory Trial Attorney

Aimee L. McFerren
Kentucky Bar No.: 89912
Federal I.D. No.: 36953
EQUAL EMPLOYMENT OPPORTUNITY
 COMMISSION
600 Dr. Martin Luther King, Jr. Place
Suite 268
Louisville, KY 40202
502-582-6308
502-582-5435 (fax)
Aimee.mcferren@eeoc.gov

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and accurate copy of EEOC's Pretrial Brief was sent via facsimile (without exhibits) and via first class mail on this ___ day of January, 2010 to:

Kathryn A. Quesenberry
Erin M. Roark
Joseph P. Donohue
DINSMORE & SHOHL LLP
2500 National City Tower
Louisville, KY 40202-3175

Aimee L. McFerren
Kentucky Bar No.: 89912
Federal I.D. No.: 36953
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
600 Dr. Martin Luther King, Jr. Place
Suite 268
Louisville, KY 40202
502-582-6308
502-582-5435 (fax)
Aimee.mcferren@eeoc.gov